FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ FEB 2 3 2017 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
SHARADA KARKI,

                          Plaintiff,

        -against-

CAROLYN COLVIN, ACTING COMMISSIONER
OF SOCIAL SECURITY

                          Defendant.
---------------------------------------------------------------x

**MEMORANDUM & ORDER**

13-CV-06395 (SLT)

**TOWNES, United States District Judge:**

Plaintiff Sharada Karki seeks review of a final decision of the Commissioner of Social Security ("SSA"), denying Plaintiff's application for Social Security disability benefits and Supplemental Security Income benefits. Plaintiff seeks judgment on the pleadings under Federal Rule of Civil Procedure 12(c). (ECF No. 14.) The Commissioner opposes Plaintiff's motion and has also cross-moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(b) and (c). (ECF No. 16.) Plaintiff's motion is granted to the extent that it seeks to reverse the ALJ's decision and remand for a new hearing and decision, and the SSA's cross-motion is denied.

## BACKGROUND

### I.    FACTUAL AND MEDICAL BACKGROUND BEFORE THE ALJ

Plaintiff was born in Nepal on March 6, 1954. (31, 105.[1]) She came to the United States in 1979. (32.) From 1987 through 2003, Plaintiff worked at Goldman Sachs as a data entry clerk. (33, 128.) Subsequently, she worked as a teacher's aide from 2006 through 2009. (128.) Her disability onset date is December 1, 2009. (105.)

---

[1]    Numbers in parentheses denote pages in the Administrative Record in this case.

## A.    Dr. Israel Samson, Plaintiff's Treating Internist

Dr. Samson began treating Plaintiff in 2003. (131.) The Administrative Record contains his treatment notes from close to Plaintiff's onset date in December 2009 to early September 2011. (200.) Dr. Samson's treatment notes indicate that throughout this period, he had been treating Plaintiff for achalasia, "a disorder of the esophagus that makes it hard for foods and liquids to pass into the stomach,"[2] hypothyroidism, when the body lacks sufficient thyroid hormone thereby leading to a slower metabolism,[3] and hypertension. (201-61.) He also referred Plaintiff to a gastroenterologist, neurologist, cardiologist, ontorologist, and joint specialists, all of whom sent Dr. Samson their treatment notes after examining Plaintiff. (*Id.*)

On December 9, 2009, Dr. Samson noted that Plaintiff complained of numbness in her tongue and burning in the back of her throat and tongue. (201.) The doctor diagnosed her with "severe reflux seondary [*sic*] to achalasia" and recommended a "GI"[4] follow-up. (*Id.*) He also noted that she had surgeries on her sinus and esophagus and has a history of hypothyroidism. (*Id.*) At the time, Plaintiff was taking the prescription medicines, Synthroid, which replaces a hormone normally produced by one's thyroid gland,[5] and Prilosec, to address acid reflux.[6] (*Id.*)

During 2010, Plaintiff visited Dr. Samson every few weeks to be treated for her thyroid and blood pressure. (206-08, 215-16, 231-32, 234-35, 237). In addition, she complained of swelling on the left side of her neck and burning in her shoulders. (208, 234.) She continued to

---

[2]    http://gi.surgery.ucsf.edu/conditions--procedures/heller-myotomy.aspx  (Last viewed May 25, 2016.)

[3]    http://www.endocrineweb.com/conditions/thyroid/hypothyroidism-too-little-thyroid-hormone (Last viewed May 25, 2016.)

[4]    "GI" refers to "[g]astrointestinal ... symptoms" such as "upset stomach, indigestion, nausea, vomiting, gas in the GI tract, or changes in bowel habits (e.g., diarrhea, constipation)." http://www.healthcommunities.com/general-gi-symptoms/overview-of-gi-symptoms.shtml.

[5]    http://www.drugs.com/synthroid.html.

[6]    http://www.drugs.com/prilosec.html.

take her previously prescribed medications. Dr. Samson continued to diagnose her with hypothyroidism, hypertension, and achalasia. He also noted that Plaintiff had "white coat syndrome" after checking her blood pressure during a visit, which is when "blood pressure surges when measured in the doctor's office." [7] (207.) On May 24, 2010, Dr. Samson noted that Plaintiff was experiencing dizziness and would follow up with a neurologist. (226.) Her medication list now also included Domperidon, which is used to treat, *inter alia*, "complaints of the stomach, which occur with delayed emptying of the stomach,"[8] and Lisonopril for hypertension.[9] (*Id.*) On November 21, 2010, Dr. Samson treated her for sinus pressure and diagnosed her with nasal congestion. (234-35.) On December 26, 2010, six days after Plaintiff applied for social security benefits (**II.** *infra*), she followed up with Dr. Samson to continue her thyroid treatment.

Throughout 2011, Dr. Samson continued to treat Plaintiff for the same symptoms and diagnosed her with the same conditions. (240, 244, 250-251, 257, 258, 260-61.) On February 20, 2011, the doctor noted that she was also taking Crestor, which is prescribed to treat high cholesterol,[10] and Benicar, which is prescribed to treat hypertension.[11] (240.) On May 22, 2011, Dr. Samson noted that Plaintiff was experiencing "constant chest pain" which improved when she was sitting but worsened at night, and was also suffering from pain "everywhere" due to arthritis. (244.)

---

[7]   http://www.webmd.com/anxiety-panic/features/beyond-white-coat-syndrome

[8]   http://www.drugs.com/uk/domperidone-10mg-tablets-spc-9898.html

[9]   http://www.drugs.com/lisinopril.html

[10]   http://www.drugs.com/crestor.html

[11]   http://www.drugs.com/benicar.html

On May 24, 2011, while continuing to treat Plaintiff, Dr. Samson submitted a Multiple Impairment Questionnaire. (192-99.) Dr. Samson noted Plaintiff's diagnosis of "achalasia" and "arthritis" with "pain in neck / arm / back." (192.) To the extent that the Court can read the handwritten notes, Dr. Samson also noted that her prognosis is "fair not improving," and that his diagnosis is supported by "multiple upper endoscopies"[12] and "UGI series"[13] (192, 193), but there are no copies of or notations regarding endoscopies or GI series in the Administrative Record. Dr. Samson reported that her symptoms of "chest pain," "burning pain," and pain in her "mid sternum," are "present & consistent," and occur "daily multiple times," again, as best as the Court can determine from the handwritten notes. (193, 194.) He ranged her pain level as 9 and her fatigue level as 4. (194.) In an eight-hour day, she can sit only one hour and stand/walk not at all or no more than one hour. (*Id.*) He does not recommend that she have a job that requires sitting continuously and that she has to get up and move around hourly. (*Id.*) He also recommended that she not have a job where she has to stand/walk continuously. (195.) She cannot lift or carry any weight. (*Id.*) She does not have significant limitations in repetitively reaching, handling, fingering, or lifting. (*Id.*) He further diagnosed that her symptoms would likely increase if she is placed in a competitive work environment, and that her condition would interfere with her ability to keep her neck in a constant position. (196.) He assessed that her pain, fatigue, and other symptoms are constant and severe enough to interfere with her attention and concentration, that her symptoms will last at least 12 months, that emotional factors do contribute to the severity of her symptoms, and, as best as the handwritten notes can be read,

---

[12]  "Endoscopy is a nonsurgical procedure used to examine a person's digestive tract. Using an endoscope, a flexible tube with a light and camera attached to it, your doctor can view pictures of your digestive tract on a color TV monitor." http://www.webmd.com/digestive-disorders/digestive-diseases-endoscopy

[13]  "An upper gastrointestinal (UGI) series looks at the upper and middle sections of the gastrointestinal tract." http://www.webmd.com/digestive-disorders/upper-gastrointestinal-ugi-series

described her emotional factors as "severe pain arthritis &," the rest is illegible. (197.) The doctor does not consider Plaintiff to be a malingerer. (*Id.*) He estimates that Plaintiff would be absent more than three times a month from work on average as a result of her impairments. (198.)

Despite these findings, Dr. Samson noted that Plaintiff can tolerate moderate work stress, that he does not think that Plaintiff's impairments would produce "good" and "bad days," and that Plaintiff will not need to take unscheduled breaks to rest at unpredictable intervals during an eight-hour workday. (197, 198.) There is no record that the ALJ noticed or attempted to resolve what appears to be an inconsistency in Dr. Samson's opinion.

A few weeks later, on July 10, 2011, Plaintiff complained to Dr. Samson of a sore throat and burning in her throat and on her skin. (250.) The doctor noted that it might be mouth sores. (251.) A July 26, 2011, colonoscopy report revealed internal hemorrhoids. (257.) An August 1, 2011 Echo report appeared normal. (258.) Dr. Samson's last treatment note in the Administrative Record is dated September 4, 2011, when he continued to treat Plaintiff for blood pressure and cholesterol. (260-61.) Plaintiff continued to complain about burning in her tongue. (260.) She also complained of experiencing difficulty swallowing. (*Id.*) Dr. Samson recommended a GI follow-up in three months and checking on her "labs." (261.) Dr. Samson had also received the results of Plaintiff's blood work between August 15, 2010 and May 22, 2011, all of which were normal. (230, 233, 236, 239, 242-43.)

**B.     Dr. Steven Kadish, Plaintiff's Treating Gastroenterologist**

At some point, Dr. Samson referred Plaintiff to Dr. Kadish, a gastroenterologist, who also began treating Plaintiff in 2003. (130.) The Administrative Record contains his treatment notes from January 2010 through July 2011. (262.) In sum, his treatment notes indicate that

throughout this period, Dr. Kadish treated Plaintiff for achalasia and dysphagia,[14] which he noted as causing Plaintiff to have difficulty swallowing solids and liquids as well as causing Plaintiff to experience chest pain. Dr. Kadish also treated Plaintiff for arthritis.

More specifically, on January 20, 2010, Dr. Kadish noted that two attempts at a motility study[15] for Plaintiff were unsuccessful because they had trouble placing the catheter. (203.) He noted that Plaintiff's symptoms had worsened when she stopped taking Nexium (for acid reflux) in preparation for the motility study. (*Id.*) Her symptoms were sour taste in her mouth, solids and liquids getting stuck because she had trouble swallowing, and pain in her teeth and head. (*Id.*) Plaintiff can push down the solids with liquids, but then she regurgitates the liquids. (*Id.*) Plaintiff told Dr. Kadish that since her surgery, she has been able to keep solids down, but liquids continue to cause her difficulty. (*Id.*) Dr. Kadish recommended that she return to taking Nexium and increased her dosage. Dr. Kadish diagnosed her as "status post a Heller myotomy[16] for achalasia." (*Id.*) He also noted her blood pressure at 146/96, which is high.[17] (*Id.*)

Her March 4, 2010, pathology report appeared normal to Dr. Kadish. (265.) But her motility study on the same date noted "failed swallows and an isobaric or common cavity pressure patterns throughout," with "limited or no relaxation of the LES .... The LES pressures changed inappropriately and there were inappropriate timed swallows." (266.) The diagnosis

---

[14]    "Difficulty swallowing (dysphagia) means it takes more time and effort to move food or liquid from your mouth to your stomach." http://www.mayoclinic.org/diseases-conditions/dysphagia/basics/definition/con-20033444

[15]    "An esophageal motility study (EMS) or esophageal manometry is a test to assess motor function of the upper esophageal sphincter (UES), esophageal body and lower esophageal sphincter (LES). An EMS is typically done to evaluate suspected disorders of motility or peristalsis of the esophagus. These include achalasia, diffuse esophageal spasm, nutcracker esophagus and hypertensive lower esophageal sphincter. These disorders typically present with dysphagia, or difficulty swallowing, usually to both solids and liquids even initially." https://en.wikipedia.org/wiki/Esophageal_motility_study  (Last viewed May 25, 2016.)

[16]    "The Heller myotomy is a laparoscopic (minimally invasive) surgical procedure used to treat achalasia." http://gi.surgery.ucsf.edu/conditions--procedures/heller-myotomy.aspx  (Last viewed May 25, 2016.)

[17]    http://www.heart.org/HEARTORG/Conditions/HighBloodPressure/AboutHighBloodPressure/Understanding-Blood-Pressure-Readings_UCM_301764_Article.jsp#.V2RjLbsrJMw

again was achalasia. (*Id.*)

On April 2, 2010, Dr. Kadish noted Plaintiff's symptoms as "intermittent episodes of chest discomfort that can radiate to her stomach or to her jaw." (209.) He noted that Plaintiff "had undergone a recent extensive GI evaluation including an upper endoscopy as well as a repeat motility study and barium studies," and noted the results of the motility study. (*Id.*) He also observed that Plaintiff had "minimal epigastric discomfort," and was "in no significant distress." (*Id.*) Although he advised Plaintiff to see Dr. Vohra again, Plaintiff refused because she did not want to have surgery again. (*Id.*) Dr. Kadish noted that Dr. Vohra had informed him that "there was no surgical intervention but suggested that she follow-up." (*Id.*) Dr. Kadish gave Plaintiff a trial drug that was not yet approved in the United States, advised her to see Dr. Samson for her chest pains, and to eat small meals and eat and drink at separate times. (210.)

Handwritten notes at the end of the April 2010 treatment notes indicate that on May 21, 2010, Plaintiff experienced "pain less chest pain-comfortable" and "pain in jaw-when wakes up in AM + R forehead (going to Neurologist)." (269.) Dr. Kadish's typed treatment notes for May 21, 2010, diagnose Plaintiff as "status a helimyotomy...." (270.) He also noted that her chest pain is still present but "is markedly diminished with Domperidone." (*Id.*) However, Dr. Kadish noted, upon examining Plaintiff "she continues to have some discomfort .... Perhaps there is a muscoskeletal component to this. (*Id.*) In any event, she seems to have improved on the Domperidone and I have increased the Domperidone to 20 mg. (*Id.*) I have also asked her to have small meals and eat and drink at separate times." (*Id.*)

Handwritten notes on Dr. Kadish's May 21, 2010 treatment notes indicate that on July 7, 2010, Plaintiff complained to him that she had been feeling well until two days ago when heaviness in her chest returned, similar to what she had experienced in the past. (271.) These

notes indicate that Plaintiff is taking Domperidone three times a day, that she appears well, that there is chest tenderness, that she should increase Domperidone to four times a day and take two Motrin. (*Id.*) There are no more treatment notes from Dr. Kadish for the rest of 2010.

On January 12, 2011, approximately a month after Plaintiff had filed for social security benefits, Dr. Kadish continued to treat Plaintiff for chest pain. (238.) After taking Advil for a month, Plaintiff's chest "discomfort" was alleviated. (*Id.*) But the discomfort returned after she stopped taking Advil, which was preventing Plaintiff from standing for an extended period of time. (*Id.*) This is the first and only time that difficulty with standing for extended periods of time is mentioned by any of Plaintiff's treating physicians. Plaintiff still experienced difficulty swallowing which would resolve only after she drank water. (*Id.*) Dr. Kadish's exam indicated "significant for pain" on both sides of her lower ribs and her chest wall. (*Id.*) He noted that her symptoms were caused by arthritis and motility disorder of her esophagus. (*Id.*) He recommended Tylenol or Advil for the arthritis and that she continue with Prilosec and Domperidone. (*Id.*)

About four months later, on May 24, 2011, Dr. Kadish noted that Plaintiff had a history of "an achalasia repair" and that she was complaining about chest pain that goes to her jaw, and leg pain that is worse when she wakes up in the morning. (248.) The doctor diagnosed that her chest pain "is associated with dysphagia to liquids and solids but can also occur in the absence of eating." (*Id.*) Dr. Kadish increased Plaintiff's Domperidone intake to four times a day. (*Id.*) His exam revealed "chest discomfort to palpation," but otherwise "no significant distress." (*Id.*) Dr. Kadish continued to diagnose her as "status post surgery for achalasia. She in all likelihood has a component of a continuing motility disorder, which may be contributing to her chest discomfort." (*Id.*) In addition to seeing a cardiologist, Dr. Kadish recommended that Plaintiff

see a rheumatologist. (*Id.*) On July 26, 2011, Dr. Kadish performed a colonoscopy on Plaintiff that revealed internal hemorrhoids. (257.) There are no treatment notes from Dr. Kadish for the rest of 2011.

On January 11, 2012, Dr. Kadish provided an Impairment Questionnaire for Gastrointestinal Disorders. (278-83.) The doctor indicated that he began treating Plaintiff on either July 6, 2004 or 2009 (the handwriting is unclear), that he last examined her on January 10, 2012, and that he saw her every few months. (278.) He opined that Plaintiff has achalasia and dysphagia, that she is in pain, that she gets chest pain because of food between a level one and two, and maybe has arthritis, that her experience of these symptoms is frequent, that she cannot tolerate even low stress because of work, that she will have good days and bad days, and is likely to be absent from work more than three times a month. (279-83.) He did not note how many hours, if any, that Plaintiff can sit, stand, and walk in an eight-hour workday, and whether it is medically necessary for her to not sit in a work setting. (281.) He opined that Plaintiff can occasionally lift or carry up to but no more than five pounds. (282.)

### C. Dr. Ellen Braunstein, Plaintiff's Treating Neurologist

Dr. Braunstein, a neurologist, treated Plaintiff in 2010. On April 29, 2010, Plaintiff complained to Dr. Braunstein about "burning pain" and that her "whole body aches." (217-18.) Dr. Braunstein diagnosed that esophagitis was causing pain on the top of Plaintiff's head. The doctor recommended a brain MRI and EEG, "and a Neurotrax evaluation for cognitive functioning with headaches." She also noted that Plaintiff had a history of thyroid disease, reflux esophagitis, and sciatica.

In early May 2010, Dr. Braunstein received a report that Plaintiff's MRI results were normal, "MRI brain without contrast" (219-20), as were the results of Plaintiff's EEG. (221.)

Later that month, Dr. Braunstein performed a Brief Cognitive Assessment Battery test[18] on Plaintiff which also yielded normal results. (222-225.) On May 18, 2010, Dr. Braunstein noted that Plaintiff is "doing OK, except that every now and then when she gets the reflux esophagitis, she gets the burning sensation up her neck and into her head," and that the pain in her lower back has returned but is getting better with rest. (295.) Test results dated May 21, 2010, indicated that Dr. Braunstein found Plaintiff's results to be "within normal limits." (297-98.) Test results dated May 25, 2010, noted that Dr. Braunstein found that if Plaintiff were to move her head too quickly, she will experience "oscillopsia (movement of the visual field)." (300.) Dr. Braunstein nonetheless concluded that the results were "within normal limits." (*Id.*)

On June 24, 2010, Dr. Braunstein noted that Plaintiff is still experiencing stiffness on the top of her head, but it is also "beginning to feel a little better," and that the area is tender. (227.) The doctor also found that Plaintiff has "a lot of pain limitation within the cervical region" and "paraspinous muscle spasms ...." (*Id.*) Dr. Braunstein prescribed Flexeril 10 mg, "a muscle relaxant,"[19] and noted that because of Plaintiff's history with "reflux esophagitis," she did not prescribe an anti-inflammatory. (*Id.*) Dr. Braunstein's medical file includes a two-page "Patient Analysis" on Plaintiff that lists the following as "Transaction Description" from April 29, 2010, through June 24, 2010: headaches, "memory disturbance and neuropsychological testing, seizures/convultions, demyelination, vertigo of central origin, and hemisensory loss/paresthesian/numbness/tingling. (288-89.)

### D.    Dr. Sheldon Genack, Plaintiff's Examining Otolaryngologist

Dr. Genack treated Plaintiff only on January 6, 2010. (202.) The doctor noted Plaintiff's

---

[18]    This test is "intended to help a clinician determine which patients require more comprehensive cognitive evaluation." (222.)

[19]    http://www.drugs.com/flexeril.html.

history of esophageal spasm, that she underwent laparoscopic fundoplication[20] in 2006, and that she told him that she had had thee sinus surgeries for polyps, the last one in 2001. (*Id.*) His examination confirmed "prior endoscopic sinus surgery." (*Id.*) Plaintiff complained to Dr. Genack of experiencing pain over her cheeks and diffuse scalp tenderness for about a month. (*Id.*) The doctor observed scalp tenderness but found no swelling. (*Id.*) He recommended autoimmune blood work to determine the cause of the "scalp tenderness," which he noted may be related to "some autoimmune condition or fibromyalgia ...." (*Id.*) Dr. Genack suggested that Plaintiff try Prednisone, an anti-inflammatory,[21] beginning at 40 mg "with a taper over eight days." (*Id.*)

### E.  Dr. Lori Cohen, Plaintiff's Examining Oral and Maxillofacial Specialist

Dr. Cohen, an oral and maxillofacial specialist, also treated Plaintiff only once, on July 19, 2010. (229.) Dr. Cohen noted Plaintiff's symptoms as experiencing a burning sensation in her throat and mouth for the past two weeks, which pain was acute at night while she was in bed. Plaintiff experienced the same symptoms about a year earlier that had resolved itself. (*Id.*) The doctor asked Plaintiff how Plaintiff addressed her GERD, a digestive disorder,[22] including whether Plaintiff sleeps with her head elevated. (*Id.*) Dr. Cohen noted that Plaintiff is in Dr. Kadish's care for gastric reflux disease, and that she suffers from spasm of the esophageal sphincter and has had surgery for it. (*Id.*) Dr. Cohen recommended that Plaintiff alter her eating and sleeping habits, prescribed Xanax (used to treat anxiety disorders, panic disorders, and

---

[20]  "Laparoscopic Nissen fundoplication is now considered the standard surgical approach for treatment of severe gastroesophageal reflux disease (GERD)." http://emedicine.medscape.com/article/1892517-overview (Last viewed May 25, 2016.)

[21]  http://www.drugs.com/prednisone.html.

[22]  "Gastroesophageal reflux disease, or GERD, is a digestive disorder that affects the lower esophageal sphincter (LES), the ring of muscle between the esophagus and stomach. Many people ... suffer from heartburn or acid indigestion caused by GERD." http://www.webmd.com/heartburn-gerd/guide/reflux-disease-gerd-1 (last visited June 3, 2016.)

anxiety caused by depression),[23] and recommended Pepcid AC, an over-the-counter medication used to address heartburn. (*Id.*)

### F.    Dr. Eric Steinberg, Plaintiff's Examining Cardiologist

Dr. Steinberg, a cardiologist, examined Plaintiff only once, on June 13, 2011, after the Agency rejected her application for benefits. (249.) Dr. Steinberg noted Plaintiff's symptoms as

> new onset/progressive right greater than left-sided chest pains that are described as a pressure like sensation and at times can be as intense as +10/10. Symptoms are aggravated with touching/pressing over the focal area of discomfort and also when sleeping and lying in a lateral recumbent position. She does describe working for 9 months near the World Trade Center site shortly after 9/11, but has not had any other prior WTC exposure related symptoms ....

(*Id.*) The doctor noted that Plaintiff had "atypical chest pain syndrome, history of significant esophageal disease and normal cardiac oath from 2002-suspect noncardiac related symptoms (EG/GI/musculosketetal) but will also screen for possible underlying structural cardiovascular component." (*Id.*) Dr. Steinberg further noted that Plaintiff had received Botox injections and sees Dr. Kadish after undergoing a GI surgical procedure by Dr. Vohra in 2006. (*Id.*) He recommended an echocardiogram, carotid Doppler, and "exercise nuclear stress test." (*Id.*) He also encouraged Plaintiff to pursue diet and exercise programs and to see Dr. Kadish for a GI follow-up visit. (*Id.*)

### G.    Dr. Bruce Stein, Plaintiff's Examining Rheumatologist

Dr. Stein, a specialist in arthritis and rheumatology, examined Plaintiff on January 18, 2012. (304.) Dr. Stein noted Plaintiff's symptoms as chest pain, deep breathing, drying in eyes and mouth, extreme fatigue, headache, muscle pain and stiffness in her right forearm, left forearm, bilateral shoulders and thighs, and that "[t]he condition has existed for 12 months."

---

[23]    http://www.drugs.com/xanax.html.

(*Id.*) He also noted her history with numbness on her tongue and burning in the back of her throat and tongue. (*Id.*) Dr. Stein further noted that Plaintiff's "past medication history is significant for hypothyroidism as well as a surgical history on her esophagus." (*Id.*) He diagnosed Plaintiff with fibromyalgia,[24] dysphasia, and hypothyroidism, and noted that the resulting "muscle pain and fatigue" make her "unable to work at this time and indefinitely." (*Id.*) This is the earliest treatment note indicating a diagnosis of fibromyalgia, although earlier notes have reflected related symptoms.

On February 1, 2012, Dr. Stein, provided an Impairment Questionnaire for Fibromyalgia. (306-11.) The doctor noted that Plaintiff suffers from "gastric reflux" and "osteoarthritis," as best as the handwritten notes can be read, and that her prognosis is "fair." (306.) To the extent that the Court can read the barely-legible handwritten notes listing "the positive clinical findings" and the "location where applicable," the notations say "pain in upper torso" and "^ fatigue." (*Id.*) Dr. Stein further noted that her resulting symptoms are fatigue and joint pain in her spine, chest, shoulders, arms, hands, fingers, hips, legs, ankles, knees, and feet, that Plaintiff has trouble sleeping, that her pain is constant and at a level eight, that she is taking prescribed medications, and that her impairments will last at least 12 months. (307-08.) Dr. Stein noted that she can sit or stand/walk only two hours in an eight-hour day. (309.) He further recommended that Plaintiff not sit continuously in a work setting, that she must sit within 15 minutes, that she can occasionally lift or carry zero to five pounds, and that she cannot tolerate even "low stress" jobs. (*Id.*) He based this recommendation on the fact that Plaintiff has "pain & fatigue [that] is exacerbated by stress." (310.) Dr. Stein also noted that "anxiety forces flare

---

[24] "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues." http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/con-20019243.

up of joint pain," that she will need to take a break every half-an-hour in an eight-hour workday and rest every 15 minutes before returning to work, she will have good and bad days, she will be absent from work more than three times a month, and that the following conditions will limit her at work: psychological, need to avoid wetness, limited vision, need to avoid temperature extremes, no pushing or pulling, need to avoid fumes, gases, humidity, heights, and no kneeling, bending, or stooping. (310-11.)

## H.     Dr. Benjamin Levine, Plaintiff's Treating Joint Specialist

Although Dr. Levine treated Plaintiff on a monthly basis from December 12, 2011, to February 3, 2012 (313), the Administrative Record does not contain any treatment notes from him. The record does contain his Impairment Questionnaire for Fibromyalgia that is dated February 6, 2012. (313-18.)

In the Questionnaire, Dr. Levine diagnosed Plaintiff with "GERD, esophageal ...,￼ hypothyroidism, and LBP." (313.) Like Dr. Stein, Dr. Levine found that her prognosis is Fair but added that she is "not likely to return to previous functional state." (*Id.*) As best as the handwritten notes can be read, his "positive clinical findings" are that she has "diffuse __ pain" and "lower back pain." (*Id.*) The Court cannot read the handwritten notes indicating the "laboratory and diagnostic test results" that support Dr. Levine's diagnosis. (314.) He lists Plaintiff's symptoms as "diffuse pain," "TMJ," and "GERD." (*Id.*) He finds that Plaintiff's impairments are "reasonably consistent" with the physical and emotional impairments that he listed in the Questionnaire. (*Id.*) Dr. Levine found that pain is constant and in her thoracic spine and chest, as well as her shoulders, arms, hands, fingers, hips, legs, ankles, knees, and feet. (314-15.) He also found that her impairments will last at least 12 months. (315.) Dr. Levine noted that she can sit only one hour in an eight-hour day, and should either not stand or walk or

stand or walk for no more than an hour. (316.) Dr. Levine further recommended that Plaintiff not sit continuously in a work setting, that she must move around every 15 minutes, that she can occasionally lift or carry less than five pounds, and can never lift or carry more than five pounds. (316.) He also noted that Plaintiff cannot tolerate even "low stress" jobs because she "needs to move around" and because her joint pain "limits her ability to do physical activities." (316-17.) Dr. Levine found that depression may contribute to the severity of her symptoms and functional limitations. (*Id.*) He also found that she will need to take a break every 15 minutes in an eight-hour workday and rest five to ten minutes before returning to work; that she will have good and bad days; that she will be absent from work more than three times a month; and that her work will be limited by requirements that refrain she refrain from any kneeling, bending, or stooping. (317-18.) 2009 is the earliest date that Dr. Levine estimates these symptoms and limitations apply. (318.)

### I.     Plaintiff Applies for Benefits in December 2010

On December 20, 2010, Plaintiff filed applications seeking social security disability insurance ("DIB") and supplemental security income ("SSI") benefits. (105-13.) In her undated Disability Report (124-35), the following conditions are listed as limiting her ability to work: hypertensive cardiovascular disease, hypertension, fibromyalgia, and hypothyroidism. (127.) The following physicians are listed as those with relevant medical records:

- Dr. Steven Kadish, who treated her for "digestive disorders" and "acid reflux" from January 2003 to October 2010 (130);

- Dr. Jonathan Klahr, who treated her for "fibromyalgia" from January 2003 to October 2010 (131); and

- Dr. Israel Samson, who treated her for "hypertension" and "hypothyroidism" from January

15

2003 to September 2010 (131-32.)

On January 18, 2011, Plaintiff submitted a Work History Report (155-63) stating that she used to lift less than ten pounds in both jobs, and that as a data entry clerk, she walked for an hour, stood for an hour, sat for three hours, and wrote, typed or handled small objects for three hours. (157, 158.)

In Plaintiff's Function Report (144-54), dated February 18, 2011, Plaintiff listed the following conditions as affecting her sleep: "very often muscle spasm on chest during slipping [*sic*] time, after wake up pain in chest muscle & hard to slip [*sic*]." (146.) She was also "having problem to swallow food & having chest pain (like heart attack) since begin[ning] of 2002, after getting worst & out of job on Jan 2003, after getting worsting [*sic*] & hard to swallow even own sylavia [*sic*] & water & had done esophagus surgery 05/11/2006, after that getting better but still having problem." (147.) Her husband has to remind her sometimes to take her medication and take care of her other personal needs. (*Id.*) She used to be able to perform all household chores including cooking, but that her husband has to do most of them now because she gets "muscular pain" or vomits sometimes from not being able to swallow food or water. (147-48.) She cooks once a week, does yoga three times a week, and sometimes walks around her "house area." (*Id.*) She can talk on the phone and use her computer. (149.) She cannot lift anything heavy "even 20 lb," she can stand but not for long, she can walk only slowly, she can climb 10-15 stairs, she cannot squat. (150.) She began experiencing the pain at the beginning of 2002. (152.) The pain can last hours. (153.) When the pain arises she cannot engage in any of her daily activities. (154.)

Her Disability Worksheet (187-90) notes the intake date as December 28, 2010. (187.) It also notes information from her three treating physicians could not be obtained "due to lack of

identifying info." (187.)

**J.     In March 2011, the Agency's Consulting Physician Examines Plaintiff**

On March 22, 2011, the Agency's consulting internist, Dr. Evelyn Wolf, conducted "an internal medicine examination" on Plaintiff. (177-180.) She first noted Plaintiff's "CHIEF COMPLAINT[S]:"

> The claimant states she last worked in 2003 as a clerk for 22 years. She worked one block away from the World Trade Center on 09/11/01, and she lost her job at that time. She states that since then she has had pain all over and muscle spasm in her esophagus. She states that she had difficulty swallowing because of the muscle spasms in her esophagus, and that she had laparoscopic surgery in 2006. Since the surgery, she states she can swallow, as long as she drinks fluid with her meals.

(177.) The doctor also noted that Plaintiff was diagnosed with fibromyalgia in 2006, and again noted that she complains "of pain all over." (*Id.*) Dr. Wolf further noted her history with sinus problems and chronic sinusitis, for which she had surgery in 2001. Under "PAST HISTORY[,]" Dr. Wolf noted that in 2001, Plaintiff was hospitalized for sinusitis, and in 2006, Plaintiff was hospitalized for "muscle spasms of her esophagus." The doctor further noted that for about ten years, Plaintiff has also had hypertension. (*Id.*) Dr. Wolf listed Plaintiff's current medications which include Synthroid, Domperidone, and Prilosec. (*Id.*)

The doctor noted that "[s]he helps with the housework[,]" but provided no additional details. (178.) Dr. Wolf also conducted a "physical examination" which revealed that Plaintiff

> appeared in no acute distress. Her gait was normal. She could walk on her heels and toes without difficulty. She could fully squat. Her stance was normal. She used no assistive devices. Needed no help changing for the exam. Needed no help getting on and off the examining table. She was able to rise from the chair without difficulty.

(*Id.*) The doctor also noted that all appeared normal when she examined Plaintiff's skin and lymph nodes, head and face, eyes, ears, nose, and throat, chest and lungs, heart, abdomen,

extremities, and fine motor activity of her hands, as well as when she conducted a

"musculoskeletal" examination. (178-79.)

>Dr. Wolf's "DIAGNOSIS" of Plaintiff was:

>1. Fibromyalgia, by history; no trigger points were elicited.
>2. Hypertension, by history.
>3. Muscle spasm of esophagus, by history; she had a laparoscopic surgery and states she no longer has a problem with swallowing.

(179.) She described Plaintiff's "PROGNOSIS" as "[s]table." (*Id.*) Dr. Wolf concluded that

Plaintiff has limited capacity only with sitting:

>In my opinion, the claimant is not limited in walking, standing, or climbing. There is no limitation in sitting, provided she can stretch from time to time. She is not limited for lifting. There is no limitation on use of her hands for fine or gross activities.

(180.)

### K.      On March 30, 2011, the SSA Denied Plaintiff Benefits

On March 30, 2011, the Agency evaluated Plaintiff's residual functional capacity

("RFC") (181-86). Plaintiff's diagnosis is listed "primarily" as "hypertension" and "secondarily"

as "fibromyalgia." (181.) It notes that Plaintiff can occasionally lift and/or carry 50 pounds,

frequently lift and/or carry 25 pounds, stand/walk about six hours in an eight hour workday, push

and/or pull unlimited. (182.) Plaintiff can frequently climb stairs, ladder/rope/scaffolds,

balance, stoop, kneel, crouch, crawl, and established no manipulative or visual or communicative

or environmental limitations. (183-84.) The report further notes that treating or examining

source statements regarding Plaintiff's physical capacities are in the file and that their

conclusions about her limitations or restrictions are not "significantly different" from these

findings. (185.) This notation is clearly not accurate. It further notes that Plaintiff alleges

disability due to hypertension and fibromyalgia, and alleges muscle spasm and gets "pain

treatment" due to "MDI." (186.) It notes that Plaintiff said that she can lift up to twenty pounds,

climb 10-15 stairs, that this is "credible," and that she walks slowly and cannot squat. (186.) It also notes that she can cook, needs no assistance in walking or arising. (*Id.*) It concludes that she "has from [*sic*] for medium SGA [substantial gainful activity]. She can do her prior work. Since she can do SGA, claim is denied for benefits." (*Id.*) The report is signed by a "single decision-maker," W. Cohen. (*Id.*) W. Cohen does not indicate in this report the basis for this assessment of Plaintiff.

The Agency denied Plaintiff's application for benefits (58-62), explaining that:

> You said you were disabled because of high blood pressure, and a back problem, and a joint problem. The medical evidence shows that you had normal blood pressure, and pain and stiffness with some restriction of your activities. The reports did not show any conditions of a nature that would prevent you from working. Since you were treated, your condition has improved. Based on your description of your job as a teacher aide, your condition does not prevent you from performing this work.

(58.) The only medical report that the Agency had when it made this determination was the consultative physician's report because "no other reports were available." (*Id.*) On December 13, 2011, the Agency granted Plaintiff's request for a hearing to appeal this decision. (77-81.) The hearing was scheduled for February 8, 2012. (77.)

## II.    THE FEBRUARY 8, 2012 HEARING IN FRONT OF THE ALJ

On February 8, 2012, ALJ Andrew S. Weiss held a hearing on Plaintiff's application for benefits. (30-49.) Plaintiff was represented by Carolyn Costello, a non-attorney from Binder & Binder, the law firm that is also representing her in this proceeding. (30.) Plaintiff, the only testifying witness, has limited English speaking skills. The ALJ had a difficult time understanding her answers and ended the hearing unclear about the nature of her conditions and symptoms.

At the hearing, Plaintiff testified that she used to work for Goldman Sachs doing data entry while sitting at a computer. (33.) She stopped working that job in 2003 because of her back pain and because "muscle is bad, my esophagus is bad." (35.) But she also testified, in response to the ALJ's questioning, that she was laid off from that job and received a severance. (42-44.) What is unclear based on her answers is whether she was forced to leave or whether she chose to leave. (*Id.*) She subsequently tried a part-time job as a teacher's aide where she would ride on the school bus and bring the children into the school building. (35-6.) She stopped working as a teacher's aide because "when I stand up, my esophagus, you know, like I feel like a heart attached. It squeeze pain and then I could." (36.) Plaintiff testified that she quit that job because she found it "stressful" to stand for that long, she "cannot tolerate for too long ...." (47.) Now, she even has trouble sitting because of pain in her lower back. (48.)

When the ALJ asked about a treatment note which indicated that she was "improving" and asked whether her "esophagus problem" is improving, Plaintiff responded: "No, the same thing. It's not --." (36.)

"Q: Well, what's wrong?

A: I cannot tell. You know, that sometime I feel faint and it – I feel like a heart attack and I cannot – you know, it's pain everywhere, in here and in here, even I cannot sit."

(36.) Plaintiff responded yes when asked if she had gastroesophageal reflux disease. (37.) She testified that neither the surgery nor the Botox injections had helped. (*Id.*) She explained that when she eats, she also has to drink water in order to be able to swallow her food. (38.) The ALJ responded that if she can swallow, "what is the problem?" (*Id.*) Plaintiff responded that she cannot swallow so she has to eat slowly in order to swallow. "And then the food is stuck in here. Sometimes it doesn't go down. I have to throw it, you know." (39.)

Ms. Costello then pointed out that Dr. Samson's medical file includes a note that in 2006, Plaintiff had laparoscopic fundoplication. (39.) Perhaps, Ms. Costello said, this is the surgery to which Plaintiff has been referring. (*Id.*) Ms. Costello further explained that "[t]hey don't really know exactly what's causing it. They did a Heller myotomy, whatever that is, for the achalasia, that's [exhibit] 5-F." (40.) The ALJ responded that "it really says nothing." Ms. Costello further said that "it doesn't say that much at all, other than the fact that she keeps having the symptoms. But that's one of just a few problems that she has." (*Id.*) The ALJ responded that "this is normal, that everything is normal in this. The only thing that it says there was a prior surgery." (*Id.*)

Ms. Costello responded "[r]ight, and in the ensuing pages there are numerous reports from neurologists, neuropsychological evaluation because, apparently, there was a problem with cognition as well, and they're trying to find out what's the cause of all of this. One doctor suggested maybe it's related to the fibromyalgia and if, in fact, that's the case, that would explain why there aren't" (*Id.*) The ALJ said, however, that fibromyalgia has never been a diagnosis, but rather just a "suggest[ion]." (40-41.) That is incorrect. Dr. Wolf noted that Plaintiff told her that Plaintiff was diagnosed with fibromyalgia in 2006. (177.) Moreover, Dr. Stein also diagnosed Plaintiff with fibromyalgia on January 18, 2012. (304.) And Plaintiff listed Dr. Jonathan Klahr as the physician treating her for fibromyalgia and who she has been seeing since 2003. (130-32.)

Ms. Costello responded that "nobody's doubting that she's got all these problems," they just cannot name exactly what is causing her problems. (41.) "[T]his shouldn't discredit the fact that she's got this severe constellation of impairments." (*Id.*) Ms. Costello points out that at page 49 of Exhibit 5-F, it notes that Plaintiff "has a component of a continuing motility

disorder," which, she said, supports a diagnosis of achalasia. (*Id.*) Ms. Costello also notes that the bulk of Dr. Wolfe's, the consulting examiner's, report "is what you would expect for a strict orthopedic examination;" hence, it is no surprise that her conclusion is only that Plaintiff has trouble swallowing. (45.)

Plaintiff testified that she now spends time at home watching television and using a heating pad when she is in pain. (46.) Plaintiff cannot use her computer because she gets back pain. (*Id.*) In response, the ALJ stated that "there's no etiology here ...." (47.) Ms. Costello responded: "Right. Right, but I mean based on the RFC's that we have based on her testimony, if she can't sit for that long and she can – and she can't function well throughout an eight-hour day, five days a week, she can't work. I mean, she tried, for the better part of two-and-a-half years, to work part-time and she couldn't even do that." The ALJ responded: "Yes, that's true." (*Id.*)

## III.    THE ALJ DENIED PLAINTIFF DISABILITY BENEFITS

On February 22, 2012, ALJ Weiss issued a decision concluding that under the social security regulations, Plaintiff has not been disabled since her onset date of December 1, 2009. (19.) In making this determination, the ALJ used the five-step sequential evaluation process prescribed by 20 C.F.R. § 404.1520(a). (20.) Under this five-step process, the SSA must <u>first</u> determine the claimant's work activity. If the claimant is currently engaging in "substantial gainful employment" ("SGE"), the claimant is not disabled, regardless of the medical findings or the claimant's age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(b). <u>Second</u>, if the claimant is not currently engaged in SGE, the ALJ must next consider the "medical severity" of the claimant's impairment. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant does not have a "severe medically determinable physical or

mental impairment that meets the duration requirement," meaning that it is expected to lead to death, has lasted or will last for a continuous period of at least 12 months, 20 C.F.R. § 416.909, "or a combination of impairments that is severe and meets the duration requirement," the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(ii).

Third, the medical severity of the claimant's impairments or combination of impairments is compared to those impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"). If the claimant has an impairment or combination of impairments which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is disabled. 20 C.F.R. §§ 416.920(a)(4)(iii), 404.1520(d). If not, the Agency must proceed to the fourth step.

At the fourth step, the Agency determines the claimant's RFC, which is the claimant's ability to do his or her "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(e), 404.1545, 416.920(e), 416.945. "Past relevant work" means a job performed within the last 15 years or 15 years prior to the date that disability must be established. The work must also have lasted long enough for the claimant to learn to do the job and have been SGA. 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965. If the claimant has the RFC to perform his or her "past relevant work," the claimant is not disabled.

Otherwise, the Agency then determines the fifth step which is whether the claimant can do any other work considering the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(e). If such an adjustment cannot be made and the duration requirement is met, the claimant is determined to be disabled. As to this fifth step, the Agency bears the burden of proof and must show that other work exists in significant numbers in the national economy that the claimant can do. 20 C.F.R. §§ 404.1512(g),

404.1560(c), 416.912(g), 416.960(c). The claimant bears the burden with respect to the first four steps. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

In performing this five-step analysis, the ALJ found that Plaintiff had not engaged in SGA since December 1, 2009. (21.) The ALJ also found that Plaintiff would have been "insured through March 31, 2012," so she had to establish disability on or before that date to be entitled to DIB benefits, a burden that she failed to meet. (*Id.*) The ALJ found that Plaintiff had "the following severe impairments: fibromyalgia, hypertension, and history of muscle spasm of the esophagus," and that these impairments "cause significant impairments on Plaintiff's ability to perform basic work activity." (*Id.*) However, he discredited Plaintiff's testimony at the hearing that cognitive problems are also making her disabled because the ALJ found no evidence of "memory loss or confusion." (21.) He held, therefore, that her cognitive problems are not severe. (*Id.*) He also found that her non-cognitive impairments were not so severe as to meet or medically equal the criteria of an impairment listed in Appendix I. (22.) He concluded that Plaintiff had the RFC to perform the full range of sedentary work (*id.*), which

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). Specifically, the ALJ found that Plaintiff has the RFC to lift or carry up to 10 pounds, and in an eight-hour day, can sit up to six hours and stand or walk up to two hours. (*Id.*) The ALJ did not credit her testimony that she cannot work due to pain in her back and esophagus because Plaintiff told Dr. Wolf that she can swallow as long as she drinks with her meals. (*Id.*) He also did not credit her testimony that her husband does the housework because she told Dr. Wolf that she helps with the housework. (*Id.*) The ALJ also found that

24

Goldman Sachs did not fire Plaintiff but rather she was laid off as a data entry clerk. (*Id.*)

The ALJ held that "[a]lthough the record confirms a diagnosis of fibromyalgia, hypertension, history of muscle spasm of the esophagus, it does not support her allegations of disability." (*Id.*) He highlighted a treatment note from each of the medical files of Drs. Kadish, Samson, and Braunstein, all of which indicated that Plaintiff was generally in good health. (*Id.*) The ALJ added that Plaintiff has not been hospitalized or been to an ER since her 2006 operation. (*Id.*) He held that Plaintiff's alleged symptoms are inconsistent with Dr. Wolf's findings. (23.) In determining Plaintiff's RFC, he assigned "significant weight" to Dr. Wolf's opinion. (*Id.*) He assigned "little weight" to the opinions of Drs. Kadish, Samson, Levine, and Stein because they are inconsistent to their treatment notes and "the substantial evidence of record." (*Id.*)

The ALJ also concluded that "[a]fter careful consideration of the evidence," he "finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (23.)

The ALJ found that Plaintiff can perform her "past relevant work" as a data entry clerk and that the job does not require performing activities precluded by her RFC. (23-4.) He also found that Plaintiff has not been under a disability under the social security regulations since her alleged onset date of December 1, 2009, through the date of his decision. (24.)

He concluded that based on Plaintiff's application for DIB, she is not disabled under §§ 216(i) and 223(d) of the Social Security Act, and that based on her application for SSI, she is not disabled under § 1614(a)(3)(A) of the Social Security Act. (*Id.*) On July 31, 2013, Plaintiff

25

sought review of the ALJ's decision by the Appeals Council, which denied her request for review. (5-8.)

## IV.    THIS LITIGATION

On November 19, 2013, Plaintiff instituted this action seeking a review of the denial of benefits under § 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (ECF No. 1.) On April 15, 2014, Plaintiff moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). (ECF No. 14.) Plaintiff argues that the ALJ failed to follow the treating physician rule by giving "little weight" to the opinions of the treating physicians, Drs. Samson, Levine, and Kadish, and the examining rheumatologist, Dr. Stein, on the grounds that their opinions were "inconsistent with [their] own clinical findings and the substantial evidence of record." (Pl. Memo. of Law 8, ECF No. 15.) Plaintiff calls the ALJ's opinion "cryptic" because the ALJ failed to specify what findings in the treatment notes or other evidence provided the "substantial evidence" to deny those physicians' opinions "controlling weight." (*Id.* at 9, 13.) Plaintiff further argues that the contradicting opinion from Dr. Wolf should be entitled to only "little weight" because she examined Plaintiff only once and did not have any of Plaintiff's treatment records. (*Id.* at 10-11.)

On July 20, 2014, the SSA opposed Plaintiff's motion and also cross-moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(b) and (c). (ECF No. 16.) The SSA argues that "[a] treating physician's statement that the claimant is disabled cannot itself be determinative." (Def. Memo. of Law 19, ECF No. 17.) It also argues that the ALJ "reasonably relied on Dr. Wolf's findings in determining plaintiff's RFC to perform the least of all strenuous work, sedentary. Therefore, she was capable of resuming her past work as a data entry clerk which she described as requiring sitting all day and lifting less than 10 pounds." (*Id.* at 19.) It

26

further argues that the ALJ's opinion was specific enough because he "summarize[d] the findings of Drs. Samson and Kadish ... and cites to the particular exhibit in administrative record where the examination notes can be found." (*Id.* at 20.) It argues that an ALJ "is not required to explicitly set forth and analyze every piece of evidence in the record." (*Id.*) It is clear, according to the Agency, why the ALJ did not give "controlling weight" to the opinions of Drs. Samson, Kadish, Levine, and Stein. (*Id.* at 20-23.)

## DISCUSSION

## I.   DISABILITY TO RECEIVE DIB OR SSI BENEFITS

In order to obtain either DIB or SSI benefits, an adult must be disabled; that is, "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 1382c(a)(3)(A). The physical or mental impairment or impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. §§ 1382c(a)(3)(B). "[W]ork ... exists in the national economy ... [if it] exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

## II.   STANDARD OF REVIEW FOR THE ALJ

As discussed in **III.** *supra*, § 404.1520(a) of the Social Security regulations provides that the ALJ is required to use a five-step process in deciding whether a claimant is disabled. In conducting that process, the ALJ "must consider (1) objective medical facts and clinical findings, (2) diagnoses and medical opinions of examining physicians, (3) the claimant's subjective evidence of pain and physical incapacity as testified to by himself and others who observed him,

and (4) the claimant's age, educational background, and work history." *Carroll v. Sec'y of Health & Human Serv.*, 705 F.2d 638, 642 (2d Cir. 1983).

## A.    The Treating Physician Rule

Under what is referred to as the treating physician rule, a treating physician's opinion regarding the nature and severity of a claimant's impairments must be given "controlling weight" so long as the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record ...." 20 C.F.R. § 404.1527(c)(2). However, such opinions will not be given controlling weight "where they are contradicted by other substantial evidence in the record." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted). "[T]he less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citations omitted). "Because the treating physician's opinion is binding on the fact-finder unless there is substantial evidence to the contrary, we must review the record to determine whether it contains substantial evidence contradicting [the treating physician's] opinion that claimant is incapable of performing sedentary work." *Murdaugh v. Secretary of the Dep't. of Health & Human Services*, 837 F.2d 99, 101-02 (2d Cir. 1988) (citation omitted). Even if the ALJ does not accord the treating physician's opinion controlling weight, in determining what weight to give to that opinion, the ALJ should "apply" the following factors: (1) the "[l]ength of the treatment relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment relationship;" (3) the evidence that supports a treating physician's report; (4) how consistent a treating source's opinion is with the record as a whole; (5) the specialization of the source in contrast to the condition being treated; and (6) "any other significant factors." 20 C.F.R. § 404.1527(c).

It is the ALJ, not the reviewing court, who resolves issues of credibility as to lay testimony or chooses between properly submitted medical opinions. *Fishburn v. Sullivan*, 802 F. Supp. 1018, 1023 (S.D.N.Y. 1992) (citations omitted); *Carroll*, 705 F.2d at 642; *Richardson v. Perales*, 402 U.S. 389, 399 (1971). But an ALJ is not "permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion ...." *Burgess*, 537 F.3d at 131 (internal quotation marks and citations omitted). Nor can the ALJ set his own expertise against that of any physician who submitted an opinion to or testified before the ALJ. *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998).

After such consideration, the ALJ must "comprehensively set forth the reasons for the weight assigned to a treating physician's opinion," *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004), including "giv[ing] good reasons" for not providing controlling weight to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2). The Second Circuit will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and ... will continue remanding when encountering opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 33.

## B.    Developing the Record

Before an ALJ can determine the weight to give the treating physicians' opinions, the ALJ must develop the record. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008). Indeed, "[i]n light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" *Id.* at 129 (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)).

## C.    Subjective Evidence of Claimant's Symptoms

In determining whether a claimant is disabled, the SSA must also consider subjective evidence of pain or disability testified to by the claimant. *See* 20 C.F.R. § 404.1529(a). "Factors relevant to [the claimant's symptoms], such as pain, which [the SSA] will consider include[e]: (i) ... daily activities; (ii) the location, duration, frequency, and intensity of ... pain or other symptoms; (iii) ... precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication ... taken to alleviate pain or other symptoms; (v) treatment, other than medication; (vi) any measures ... used to relieve pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning ... functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c)(3). To the extent that the ALJ resolves issues of credibility as to lay issues, the ALJ must explain the "reasons for that conclusion with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

## III.    STANDARD OF REVIEW FOR THE DISTRICT COURT

The Social Security Act provides that "any individual" can file a civil action seeking a review of the final decision of the SSA after the hearing in front of an ALJ. 42 U.S.C. § 405(g). After conducting this review, the district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Id.*

But a district court's review under 42 U.S.C. § 405(g) is not *de novo*, it is more limited. *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984). The court is empowered to determine

only whether the SSA's conclusions are "supported by substantial evidence in the record and ... based on a correct legal standard." *Lamay v. Astrue*, 562 F.3d 503, 507 (2d Cir. 2009); *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). "Substantial evidence" connotes "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citations omitted); *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). "[T]he court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y.1991). "It is the province of the SSA, not a district court, to weigh the conflicting evidence in the record." *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998); *Valente v. Secretary of Health and Human Servs.*, 733 F.2d 1037, 1042 (2d Cir. 1984)). The district court may not make its own findings of fact. *Valente*, 733 F.2d at 1042. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ...." 42 U.S.C. § 405(g).

Similar deference, however, is not accorded to the SSA's legal conclusions or to the SSA's compliance with applicable procedures mandated by statute or regulation. *Townley*, 748 F.2d at 112. "Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Id.* (internal quotation marks and citation omitted). It "is grounds for reversal." *Id.* (citation omitted). However, where application of the correct legal principles to the facts on the record could lead only to the same conclusion reached by the Agency, there is no need to remand the case for

Agency reconsideration. *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (internal quotation marks and citation omitted).

## IV.   ANALYSIS

### A.   Medical Opinions

In concluding that Plaintiff has the RFC to perform the full range of sedentary work, the ALJ impermissibly "substitute[d] his own view of the medical proof for the treating physician[s]' opinion[s]." *Burgess*, F.3d at 131. The ALJ concluded that Plaintiff had the following "severe impairments:" "fibromyalgia, hypertension, and muscle spasm of the esophagus," but that the record does not support her allegations of disability. (22.) He found that she has the RFC to lift or carry up to 10 pounds, and in an eight-hour day, she can sit up to six hours and stand/walk up to two hours. (22.) But the ALJ's RFC assessment is contrary to Plaintiff's treating physicians' assessments.

Contrary to the ALJ, Dr. Kadish opined that she can only occasionally lift or carry no more than five pounds, but did not opine on how many hours she can sit or stand during a workday. (282.) Dr. Kadish also opined that she cannot tolerate even low stress at work, that she will have "good days and bad days," and is likely to be absent from work more than three times a month. (278-83.) Dr. Kadish based this assessment on his diagnosis that Plaintiff has achalasia and dysphagia, and frequently experiences chest pain because of trouble swallowing food. (*Id.*) Dr. Samson opined that in an eight-hour workday, Plaintiff can sit only one hour and stand/walk not at all or only an hour, and that she cannot lift or carry any weight. (194.) Dr. Samson based his opinion on his diagnosis that Plaintiff has achalasia and arthritis, and that she suffers constant and burning pain in her chest, neck, arm, and back. Dr. Samson does not recommend that Plaintiff have a job where she has to sit or stand continuously, opined that Plaintiff's condition is "fair not improving," and that his diagnosis is supported by "multiple

upper endoscopies" and "UGI series." (192, 193.) Dr. Levine opined that she cannot sit for more than an hour, that Plaintiff cannot sit continuously in a work setting, that she must move around every 15 minutes, and that she can occasionally lift or carry no more than five pounds. (316.) He also opined that because of Plaintiff's impairments, she has constant pain all over her body and that the impairments will last at least 12 months. (*Id.*)

All three treating physicians found that Plaintiff cannot perform sedentary work, just in varying degrees. Yet, the ALJ accorded "little weight" to their opinions concluding that the opinions were inconsistent with treatment notes and the substantial evidence on the record. (22.) As to Dr. Kadish, the ALJ appeared to base his conclusion on just one of Dr. Kadish's treatment notes which states that Plaintiff appeared "healthy" and that an examination showed "minimal epigastric discomfort without any rebound or guarding." (21.) But the ALJ failed to explain the relevance of these two issues to her impairments of fibromyalgia, hypertension, and muscle spasm of the esophagus. At the very least, before according little weight to Dr. Kadish's opinion, the ALJ should have further developed the record to determine whether "epigastric discomfort" is even relevant to Plaintiff's impairments. *Rosa*, 168 F.3d at 79.

The ALJ ignored the rest of Dr. Kadish's medical file which spans a year-and-a-half from Plaintiff's onset date and appears consistent with Dr. Kadish's opinion. It reflects that: a motility study revealed that Plaintiff is having trouble swallowing and "limited or no relaxation of the LES [lower esophageal sphincter]" (266), Plaintiff needs to drink liquids to swallow the solids, but sometimes regurgitates the liquids (203, 238), and this trouble swallowing leads Plaintiff to have chest pain. (209, 269, 270, 271, 238, 248.) Just three weeks before the ALJ conducted the hearing, Plaintiff had difficulty standing up for an extended period of time because of chest pain. (238.) Dr. Kadish had also increased the frequency with which Plaintiff was to take

Domperidone to address her stomach and chest pain, and Nexium to address acid reflux. (263.) In focusing on just one of Dr. Kadish's treatment notes to support the ALJ's RFC assessment while ignoring the substantial medical evidence in the rest of Dr. Kadish's medical file, the ALJ impermissibly "substitute[d] his own expertise or view of the medical proof for the treating physician's opinion." *Burgess*, 537 F.3d at 131. Where, as here, the ALJ provides no explanation for this exclusion, his opinion lacks the specificity needed for this Court to determine whether according "little weight" to Dr. Kadish's opinion is consistent with substantial evidence in the record. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) (reversed and remanded "for more detailed findings"); *Kendall v. Apfel,* 15 F.Supp.2d 262, 268 (S.D.N.Y. 1998).

Concluding that Dr. Samson's notes "frequently showed no reports of myalgia, back pain, or joint pain and characterized the claimant's blood pressure as 'stable'," the ALJ accords "little weight" to Dr. Samson's opinion. (22.) However, the ALJ ignored the rest of Dr. Samson's medical file which reflects that Dr. Samson continued to treat Plaintiff for blood pressure and her thyroid from her onset date to late 2011, while prescribing Synthroid, Prilosec, and Lisonopril, for hypothyroidism, hypertension, and acid reflux. (244.) Dr. Samson also noted that Plaintiff complained to him of "constant chest pain" which improved when she sat down. (244.) The doctor also received treatment notes from the other physicians which noted that her symptoms included "whole body aches" and "burning pain" (217-18), burning in her mouth and throat (229), and high blood pressure (203). These complaints, and others, may be symptomatic of fibromyalgia, which is muscle pain, or joint pain. Presumably, Dr. Samson took these other treatment notes into account in providing his opinion on Plaintiff's RFC, yet the ALJ did not consider them.

34

Dr. Samson's opinion was not entirely inconsistent with the ALJ's RFC assessment. Dr. Samson did opine that Plaintiff can tolerate moderate work stress, that her impairments would not produce "good days and bad days," and that she will not need to take unscheduled breaks to rest at unpredictable intervals during an eight-hour workday. (197, 198.) This portion of Dr. Samson's opinion seems inconsistent with the rest of his opinion. Yet, there is no indication that the ALJ made any attempt to resolve this inconsistency and, thereby, fully develop the record.

The ALJ also accords "little weight" to Dr. Levine's opinion even though his opinion is consistent with Drs. Kadish and Samson's opinions. Moreover, the ALJ did not address the rest of the § 404.1527(c) factors before according "little weight" to the treating physicians' opinions, such as that Drs. Samson and Kadish had been treating Plaintiff for nine years by the time of the ALJ hearing, the frequency with which they examined Plaintiff, and that Drs. Kadish and Levine are specialists in fields relevant to Plaintiff's conditions and symptoms – gastroenterology and joints. The ALJ also makes no mention of the fact that the medical record indicates that emotional factors aggravate Plaintiff's symptoms. (*See e.g.,* 299, 310, 316-17.)

Instead, the ALJ accorded "significant weight" to the one-time evaluation conducted by Dr. Wolf, the consulting internist. (23.) Dr. Wolf did note Plaintiff's medical history of sinusitis and fibromyalgia, as well as Plaintiff's long list of current medications. (177.) But contrary to the treating physicians' opinion, Dr. Wolf found that Plaintiff had no limitation for "walking, standing, climbing, lifting, use of her hands for fine or gross motor activities, or sitting, as long as she can stretch from time to time." (180.) Dr. Wolf also noted a "normal" throat exam. (*Id.*) It is precisely because of this one-time encounter that Dr. Wolf's opinion should not be considered substantial evidence under the treating physician rule of 20 C.F.R. § 404.1527(d)(2). *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992); *Rosa v. Weinberger*, 381

F. Supp. 377, 380 (E.D.N.Y.1974). As the Second Circuit explained: "This is justified because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day. Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons." *Simmons*, 982 F.2d at 55 (internal quotation marks and citations omitted). Dr. Wolf also lacks the specialization that Drs. Samson and Levine have in gastroenterology and joints.

Dr. Stein has also examined Plaintiff only once. Consistent with Plaintiff's treating physicians, Dr. Stein opined that Plaintiff cannot sit for more than an hour, that she cannot sit continuously in a work setting, that she must move around every 15 minutes, and that she can only occasionally lift or carry no more than five pounds. (309-11.) Yet, the ALJ accorded "little weight" to his opinion concluding that it was inconsistent with Dr. Stein's "own clinical findings …," without further explanation. (23.) Dr. Stein's one treatment note does state that Plaintiff "has full muscle strength …." (304.) But he also notes "[j]oint tenderness" when he examined her shoulders, elbows, cervical spine, and upper and lower back, and notes inflammation around her knee and hip. (304) Dr. Stein diagnosed Plaintiff with fibromyalgia, dysphasia, and hypothyroidism, and noted that the resulting "muscle pain and fatigue" make her "unable to work at this time and indefinitely." (*Id.*) Consequently, the Court is not clear why the ALJ accorded greater weight to Dr. Wolf's opinion, especially since unlike Dr. Wolf, Dr. Stein is a rheumatologist. Without such clarity, the Court cannot determine whether the ALJ's opinion is consistent with the substantial evidence on the record. *Ferraris*, 728 F.2d at 587; *Kendall,* 15 F.Supp.2d at 268.

Moreover, the medical record is still incomplete as noted in this Memorandum and Order. There is also no medical file or opinion from Dr. Klahr who treated Plaintiff for fibromyalgia and has been her physician since 2003. (131.) "Although the ALJ provided partial explanations for [his] decisions to discount the findings of [the claimant's] treating physicians, as is required, … nothing in the record or in the ALJ's decision suggests that these decisions were reached after due consideration of all of the relevant factors …. Where an ALJ fails to consider all of the relevant factors in deciding what weight to assign the opinion of a treating physician, the ALJ's decision is flawed." *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998)); *Pagan v. Apfel*, 99 F.Supp.2d 407, 410, 411 (S.D.N.Y. 2000) (remanding case on the grounds that "[w]hile it is true that the ALJ considered (six) available medical records, … and reviewed some 202 pages of materials, … it is uncertain if adequate weight was given to the opinions of Plaintiff's treating physicians"). Therefore, this case is remanded to the ALJ for further evidentiary proceedings and/or a more detailed decision consistent with this decision.

**B.      The ALJ's Consideration of Subjective Evidence of Plaintiff's Symptoms**

The ALJ also committed error in reviewing the subjective evidence. He did not credit Plaintiff's testimony at the hearing that she cannot work due to pain in her esophagus because Plaintiff told Dr. Wolf that she can swallow so long as she drinks water with her meals. (22.) But the record is replete with notations about Plaintiff's trouble with swallowing. As far back as Plaintiff's onset date in December 2009, Dr. Samson had diagnosed her with achalasia (201). She has also been prescribed medications to address achalasia and acid reflux, Prilosec, Domperidone, and Nexium. Her diagnosis for achalasia did not change through his treatments and both before and after she sought social security benefits. She continued to complain that solids and liquids were getting stuck in her throat and having trouble swallowing, and that she

was regurgitating liquids. (203.) Dr. Kadish also increased her Nexium dosage after she complained about the symptoms returning when she went off the medication in preparation for her motility study, which reflected her trouble with swallowing and issues with her lower esophagus. (209.) After applying for social security benefits, Plaintiff still complained about experiencing these symptoms. (238, 248, 278.)

Presumably, the ALJ also did not credit her hearing testimony because she did not clearly or completely answer his questions regarding the nature and severity of these symptoms. Plaintiff, however, has limited English speaking skills. (36-9.) Nonetheless, her testimony was clear: (i) that she has to eat slowly and drink water because she has trouble swallowing and even then, sometimes she throws it up; and (ii) that she experiences "pain everywhere" like a "heart attack." (*Id.*) The ALJ could consider conducting another hearing with an interpreter for Plaintiff and/or seeking testimony from her treating physicians on this issue. This is especially the case here since the ALJ seemed puzzled during the hearing that Plaintiff's entire medical file "says nothing," appeared normal (40-41), and that "there's no etiology here ...." (47.)

The ALJ also did not credit Plaintiff's testimony at the hearing that her husband cleans their home because she told Dr. Wolf that she helps with the housework. (22.) However, "a claimant need not be an invalid to be found disabled under the Social Security Act," *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (quoting *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988), especially where a claimant does not engage in activities "for sustained periods comparable to those required to hold a sedentary job." *Id.* at 81. In *Balsamo*, the claimant "testified that he rarely left his house [except] periodically to attend church and on an occasion to help his wife go shopping ...." *Id.* The ALJ concluded that Balsamo was not "homebound because he owns and operates a motor vehicle when required," and found that he could perform

sedentary work. *Id.* But the Second Circuit disagreed by ruling that "there is no evidence that Balsamo engaged in any of these activities for sustained periods comparable to those required to hold a sedentary job." *Id.* (remanding because there was no substantial evidence for the ALJ's determination that the claimant could perform sedentary work); *see also Murdaugh v. Secretary of the Dep't of Health & Human Services*, 837 F.2d 99, 102 (2d Cir. 1988) (remanding in part because the claimant who "waters his landlady's garden, occasionally visits friends and is able to get on and off an examination table" was not held to be disabled).

Similarly here, there is no indication in the record that Plaintiff performs household chores "for sustained periods comparable to those required to hold a sedentary job." *Balsamo*, 142 F.3d at 81. The ALJ committed error to the extent that he found that Plaintiff can perform sedentary work because she helps with housework.

## CONCLUSION

Plaintiff's motion is granted to the extent that it seeks to reverse the ALJ's decision and remand for a new hearing and decision. The SSA's cross-motion is denied. This case is remanded to the ALJ for further proceedings consistent with this Memorandum and Decision.


**SO ORDERED.**

/s/ *Sandra L. Townes*

SANDRA L. TOWNES
United States District Judge


Dated: *February 21*, 2017
Brooklyn, New York